UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

BHUSHAN ATHALE, Individually and on Behalf of All
Other Similarly Situated,

                    Plaintiff,

       -v-

SINOTECH ENERGY LIMITED, ET AL,
                Defendants.

----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED: FEB 2 1 2014

11 Civ. 05831 (AJN)
(consolidated)

<u>MEMORANDUM &</u>
<u>ORDER</u>

ALISON J. NATHAN, District Judge:

      This is a securities class action brought on behalf of a class of SinoTech Energy Limited

("SinoTech" or "Company") shareholders, against (1) SinoTech; (2) a number of SinoTech

officers and directors (collectively, "Individual Defendants"); (3) UBS AG, UBS Securities LLC,

Citigroup Global Markets, and Lazard Capital Markets, which served as financial advisors to and

assisted SinoTech in its IPO (collectively, "Underwriter Defendants"); and (4) Ernst & Young

Hua Ming ("EYHM"), which served as SinoTech's auditor. *See* Compl. ¶¶ 30-44. EYHM

moves to dismiss, pursuant to Rules 8, 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure,

for failure to state a claim upon which relief can be granted. For the reasons that follow,

EYHM's motion to dismiss is GRANTED.

## I. BACKGROUND

    <u>A. Factual Background</u>

      The following facts are taken from the Second Consolidated Amended Complaint, Dkt.

No. 70, and assumed be to be true for purposes of deciding the motion to dismiss.

On November 3, 2010, SinoTech, a provider of enhanced oil recovery ("EOR") based in the People's Republic of China ("China"), conducted an initial public offering ("IPO") in the United States. Pl. Opp. 1; Compl. ¶¶ 1-2. The IPO grossed $167 million, with 19.7 million of SinoTech's American Depository Shares ("ADSs" or "shares") trading on the NASDAQ Stock Market at $8.50 per share. Pl. Opp. 1; Compl. ¶¶ 1, 52.[1] By March 22, 2011, the shares were trading at $8.69 per share. Compl. ¶ 6.

On March 31, 2011, SinoTech filed its Annual Report with the SEC on Form 20-F. Compl. ¶ 116. The Form 20-F stated that SinoTech had sales of $45.3 million for the fiscal year ending September 30, 2010. Compl. ¶ 116. The Form 20-F further indicated that 46.8 percent of sales came from its lateral hydraulic drilling ("LHD") section, 42.8 percent came from its molecular deposition film ("MDF") section, and another 10.4 percent of total sales came from its consulting section. Compl. ¶ 116. SinoTech further reported that the value of its property and equipment, less accumulated depreciation, was $64,286,601; more than 99 percent of this figure was categorized as "'[p]roduction equipment (*i.e.*, the LHD units)."[2] Compl. ¶¶ 116, 164. The Form 20-F also stated that there existed as of January 11, 2010 a contract with Tianjin New Highland ("TNH"), to purchase six units of LHD equipments for a total price of $41,248,200, or $6,874,700 per unit, $37,123,380 of which had been paid as of September 30, 2010. Compl. ¶ 118.

The same day, EYHM, which had been engaged as SinoTech's registered accounting firm since February 28, 2011, issued an "unqualified audit opinion of the Company's financial statements for the period ended September 30, 2010." Compl. ¶¶ 43, 120. That opinion stated that EYHM had "audited the accompanying consolidated balance sheet . . . and the related

---

[1] "Compl." refers to Plaintiffs' Second Consolidated Amended Complaint. Dkt. No. 70.
[2] This figure represented a significant increase from the Company's 2009 property and equipment reported net cost of $13,489,808.

consolidated statements of operations and comprehensive income, shareholders' equity, and cash flows for the year ended September 30, 2010." Compl. ¶ 120.  EYHM noted that the "financial statements are the responsibility of the Company's management" and indicated that its only "responsibility [was] to express an opinion on the[] financial statements based on [its] audit." Compl. ¶ 120.  EYHM further noted that it conducted the audit in accordance with Public Company Accounting Oversight Board ("PCAOB") standards, but warned that it was "not engaged to perform an audit of the Company's internal control over financial reporting" and therefore expressed no opinion as to the effectiveness of SinoTech's internal control over financial reporting.  Compl. ¶ 120.  The opinion concluded that, "the consolidated financial statements . . . present fairly, in all material respects, the consolidated financial position of SinoTech . . . at September 30, 2010, and the consolidated results of its operations and its cash flows for the year ended September 30, 2010, in conformity with U.S. generally accepted accounting principles ["GAAP"]."  Compl. ¶ 120.

On August 16, 2011, a group of online short-seller analysts known as Alfred Little issued a report ("Report"), accusing SinoTech of fraudulent financial reporting.  Compl. ¶¶ 7, 144; Compl. Ex. A at 30.  The Report "included government documents, pictures, video, phone conversations, and a detailed investigation regarding SinoTech and . . . the two EOR technologies upon which SinoTech's Class Period operations were reportedly based."  Compl. ¶ 7.  The Report indicated that the Company's "sole import agent accounting for over $100 million worth of oil drilling equipment [LHD] orders appears to be an empty shell with no sign of operation, a limited import history and negligible revenue base."  Compl. ¶¶ 117, 144.1. Additionally, the Report alleged that SinoTech's "sole chemical supplier [for the MDF business] appears to be an empty shell, with little or no revenues, a deserted office and no signs of

production activity." Compl. ¶¶ 117, 144.2.  Moreover, Alfred Little contended that some of the

Company's "largest subcontracting customers, providing the vast majority of CTE's revenues,

appear to be shell companies with unverifiable operations and minimal revenues." Compl.

¶¶ 117, 144.3.  The Report concluded that SinoTech's stock was "theoretically worth less than

$0.63 per share but [that] investors [would] likely recover nothing." Compl. ¶ 144.7.

In addition to the Report's allegations, Plaintiffs contend that, as of September 30, 2010,

SinoTech "owned no more than 10 LHD units in service that were worth approximately $10.72

million in total." Compl. ¶¶ 117, 121.  Plaintiffs also allege that information relating to the

purported LHD sales contracts was materially misleading, and that, *inter alia*, TJN had ordered

only two LHD units, at a price of between $600,000 and $1.28 million per unit, as of January 11,

2010. Compl. ¶ 119.  As a result, Plaintiffs contend that SinoTech's 2010 financial statements

overstated reported property and equipment assets by roughly $50 million and total assets by

more than 40 percent. Compl. ¶ 173.

On the same day as the Report's release, SinoTech's ADSs fell from its previous closing

price of $4.02 per share to $2.35 per share and NASDAQ halted trading. Compl. ¶¶ 8-9, 145-46.

On September 15, 2011, NASDAQ sent a letter to SinoTech announcing that it would delist the

Company's securities. Compl. ¶¶ 12, 152.  On September 23, 2011, amidst a flurry of executive

departures and resignations, EYHM resigned as SinoTech's auditor and repudiated its March 31,

2011 audit opinion, announcing that it had "los[t] confidence in the accuracy and reliability of

the Company's previously filed financial statements." Compl. ¶¶ 15, 43, 122.  Effective January

17, 2012, SinoTech's stock was formally delisted from NASDAQ. Compl. ¶ 18.  The Company

then listed its shares on the OTC market's "Pink Sheets," where its price fell to $0.02 per share.

Compl. ¶ 18.

On April 23, 2012, the SEC filed a lawsuit against SinoTech and individual defendants. Compl. ¶ 20.  The complaint in that action stated that the Company "grossly overstated the value of [its] primary operating assets in financial statements, specifically the lateral hydraulic drilling units ("LHD units") that are central to its business . . . acquired far fewer LHD units [than publicly advertised], lied about the number it acquired, and grossly overstated the value of the units." Compl. ¶ 20.  The SEC Complaint further indicated that an individual defendant had "misappropriated at least $40 million of SinoTech's cash between June 30, 2011 and August 2011" and then "stood by silently in August 2011 as SinoTech attempted to counter public accusations of fraud by claiming the company held $93 million in its bank accounts." Compl. ¶ 22.  On May 2, 2012, the SEC issued an Order Instituting Administrative Proceedings and Notice of Hearing Pursuant to § 12(j) of the Exchange Act.  Compl. ¶ 24.  SinoTech did not contest or challenge the SEC's actions, and on May 30, 2012, the SEC revoked registration of the Company's registered securities.  Compl. ¶ 24.

B. Allegations in Complaint

This class action was filed on August 19, 2011, against SinoTech, the Individual Defendants, and the Underwriter Defendants.[3]  Dkt. No. 1.  EYHM was named as a defendant in the Second Consolidated Amended Complaint ("SCAC"), which was filed on July 2, 2012, and which alleges that EYHM violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Compl. ¶ 202.  The claim against EYHM "stem[s] from the untrue statements of material fact made in [EYHM's] audit opinion contained in the annual report filed by SinoTech on a Form 20-F on March 11, 2011." Pl. Opp. 8; *see also* Compl. ¶¶ 168-84.  The Complaint additionally alleges that EYHM is liable under § 10(b) and Rule 10b-5 for false or misleading

---

[3] Defendant UBS Securities LLC appears to have been added in the Consolidated Amended Complaint. *See* Dkt. No. 52.

forward-looking statements made by the SinoTech Defendants during the Class Period. Compl. ¶¶ 197-99.

Plaintiffs allege that EYHM "acted with scienter in that they either knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of [SinoTech] were materially false or misleading." Compl. ¶ 192. In support, the Complaint states that EYHM "participated in the scheme in order to generate lucrative fees for conducting the audit of SinoTech's financial statements." Compl. ¶ 193.

The Complaint further alleges that EYHM "personnel were regularly present at SinoTech's offices and had continual access to, and knowledge of, SinoTech's internal accounting records, its confidential financial and non-public business documents and employees." Compl. ¶ 169. By contrast, Plaintiffs allege, "Alfred Little was able to discern [the fraudulent reporting] without any [such] access." Compl. ¶¶ 169, 180. From this, Plaintiffs infer that EYHM "knew of or recklessly disregarded adverse facts concerning the Company's improper financial reporting during the Class Period." Compl. ¶ 170. Plaintiffs allege that it follows that EYHM "knowingly, or recklessly, issued a false unqualified audit opinion on the Company's 2010 financial statements" and failed to adhere to generally accepted auditing standards ("GAAS"), GAAP, and SEC rules and regulations for auditors. Compl. ¶¶ 171-74, 182-83. Plaintiffs specifically point to EYHM's noncompliance with Auditing Standards ("AS") Nos. 12 and 15,[4] *see* Compl. ¶¶ 175, 177; GAAS Interim Audit Standards ("AU") §§ 110, 317 and 508,[5] *see* Compl. ¶¶ 176, 178, 181(a); GAAS General Standard No. 3,[6] *see* Compl. ¶ 179'

---

[4] AS are standards set by the PCAOB.
[5] AU's are the Interim Audit Standards of the PCAOB and shared by the American Institute of Certified Public Accountants.
[6] "The auditor must exercise due professional care in the performance of the audit and the preparation of the report."

GAAS Reporting Standard No. 4,[7] *see* Compl. ¶ 181(b); and SEC Accounting Series Release No. 296, *see* Compl. ¶ 184.

## II. DISCUSSION

### A. Section 10(b) and Rule 10b-5

In order "[t]o state a claim under § 10(b) and Rule 10b-5, a plaintiff must plead that: (1) the defendant made a false statement or material omission; (2) the defendant did so with scienter . . . ; [and] (3) the plaintiff relied on the statement or omission, which in turn caused the plaintiff injury." *Iowa Pub. Employee's Ret. Sys. v. Deloitte & Touche LLP*, 919 F. Supp. 2d 321, 330 (S.D.N.Y. 2013) (citing *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001)). In its motion to dismiss, EYHM challenges: (1) the adequacy of Plaintiff's pleadings with respect to whether EYHM issued its audit opinion with scienter, which is subject to heightened pleading requirements under Federal Rule of Civil Procedure 9(b) and the PSLRA; and (2) the adequacy of Plaintiffs' pleadings as to whether EYHM "made" the forward-looking statements at issue.

### B. Pleading Auditor Scienter

In general, a trial court considering a motion to dismiss under Rule 12(b)(6) "must 'accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party.'" *In re Openwave Sys.Sec. Litig.*, 528 F. Supp. 2d 236, 248 (S.D.N.Y. 2007) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). "To survive a motion to dismiss, the plaintiff's pleading must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *TufAmerica, Inc. v. Diamond*, No. 12 Civ. 3529 (AJN), -- F. Supp. 2d ---, 2013 WL 4830954, at *1 (S.D.N.Y.

---

[7] "The auditor must either express an opinion regarding the financial statements, taken as a whole, or state that an opinion cannot be expressed, in the auditor's report. When the auditor cannot express an overall opinion, the auditor should state the reasons therefore in the auditor's report. In all cases where an auditor's name is associated with financial statements, the auditor should clearly indicate the character of the auditor's work, if any, and the degree of responsibility the auditor is taking, in the auditor's report."

Sept. 10, 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)). In deciding the motion, the Court may consider the pleading itself, as well as documents attached as exhibits or incorporated by reference. *Id.* (citing *Halebian v. Berv*, 644 F.3d 122, 131 n.7 (2d Cir. 2011); *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 235 (2d Cir. 2008)).

Plaintiffs alleging securities fraud must further satisfy the heightened pleading requirements of Federal Rule of Procedure 9(b), which requires plaintiffs "alleging fraud or mistake . . . [to] state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b); *Iowa Pub. Employee's Ret. Sys.*, 919 F. Supp. 2d at 330. Under this rule, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Id.* (quoting *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004)).

The PSLRA additionally requires that complaints alleging violations of § 10(b) and Rule 10b-5 "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," which is "scienter, characterized as 'an intent to deceive, manipulate[,] or defraud.'" *Iowa Pub. Employees Ret. Sys.*, 919 F. Supp. 2d at 330-31 (citing *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d 370, 384 (S.D.N.Y. 2007); *Kalnit*, 264 F.3d at 138). In order to meet the "strong inference" standard, "[t]he inference that the defendant acted with scienter need not be irrefutable. . . or even the most plausible of competing inferences," but it must be so "cogent and compelling" that "a reasonable person would deem the inference of scienter . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007) (internal citations omitted). When making this determination, the Court should consider both "plausible, nonculpable explanations for the defendants conduct, as well as inferences favoring the

8

plaintiff." *Id.* at 324. The Court, moreover, should consider "whether *all* of the facts alleged,

taken collectively," give rise to the required inference, "and not whether any individual

allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23.

### C. Motive and Opportunity

Plaintiffs argue that scienter is established by allegations that EYHM was motivated to

"[participate] in the scheme in order to generate lucrative fees for conducting the audit of

SinoTech's financial statements." Compl. ¶ 193. In order to plead scienter by alleging that a

defendant had the motive and the opportunity to perpetrate fraud, however, a plaintiff must do

more than invoke "'magic words such as 'motive and opportunity.'" *Rothman v. Gregor*, 220

F.3d 81, 90 (2d Cir. 2000) (quoting *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000)). Rather,

the Second Circuit has instructed that scienter can only be established by "an allegation of facts

showing the type of particular circumstances that our case law has recognized will render motive

and opportunity probative of a strong inference of scienter." *Id.*

It is well established that the "mere receipt of compensation and the maintenance of a

profitable professional business relationship for auditing services does not constitute a sufficient

motive for purposes of pleading scienter." *Zucker v. Sasaki*, 963 F. Supp. 301, 308 (S.D.N.Y.

1997). *See also Doral Fin. Corp. Sec. Litig.*, 563 F. Supp. 2d 461, 465 n.1 (S.D.N.Y. 2008)

(finding that the allegation that the defendant had received "fees. . . for auditing, consulting, and

tax services and wished to continue to receive fees" insufficient to plead motive). Indeed,

Plaintiffs do not contest the inadequacy of their pleadings as to motive and opportunity in their

opposition brief, although they do insist that these pleadings "add to the holistic view of scienter

that the Court is required to consider." Pl. Opp. 15 n.8. Accordingly, the Court finds that

Plaintiffs have failed to plead scienter by alleging that EYHM had motive and opportunity to

perpetrate the fraud.

    D. Strong Circumstantial Evidence of Recklessness

"Scienter can be plead by 'alleging facts. . . constituting strong circumstantial evidence of conscious misbehavior or recklessness.'" *In re Scottish Re Group Sec. Litig.*, 524 F. Supp. 2d at 384 (quoting *Kalnit*, 264 F.3d at 139). For such allegations to plead scienter, a plaintiff must point to "conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 331 (internal citations omitted). This standard is particularly "demanding" in the auditor context, in which the "alleged misconduct must approximate actual intent to aid in the fraud being perpetrated by the audited company," or indicate "willful[] blind[ness] to the truth." *Id.* (citing *In re Scottish*, 524 F. Supp. 2d at 385) (internal quotations omitted). "Put another way, a plaintiff must allege that '[t]he accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or investigate the doubtful, or that the accounting judgments which were made were such that *no reasonable accountant would have made the same decisions if confronted with the same facts*.'" *In re IMAX sec. Litig.*, 587 F. Supp. 2d 471, 483 (S.D.N.Y. 2008) (quoting *In re Scottish*, 524 F. Supp. 2d at 385) (emphasis added).

    Here, Plaintiffs argue that the following allegations provide strong circumstantial evidence that EYHM acted with the requisite scienter: "(1) numerous red flags that [EYHM] saw yet failed to give careful attention to; (2) various violations of generally accepted auditing standards ("GAAS") and generally accepted accounting principles ("GAAP"); and (3) the sheer size of the alleged fraud." Pl. Opp. 12-13. The Court must examine these allegations both

individually and in aggregate, keeping in mind that such allegations may lend support to an inference of scienter even if they are not, on their own, sufficient to establish it. *See Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 331-32 ("[C]ourts must examine such red flags in the 'aggregate,' which prevents defendants from 'secur[ing] dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'") (quoting *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007)); *In re WorldCom, Inc. Sec. Litig.*, No. 02 Civ. 3288 (DLC), 2003 WL 21488087, at *7 (S.D.N.Y. June 25, 2003).

*1. Red Flags*

Plaintiffs contend that EYHM "knew and yet failed to sound the alarm (or recklessly failed to discover altogether)" "specific 'red flags,' that 'would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'" Pl. Opp. 15; *In re IMAX Sec. Litig.*, 587 F. Supp. 2d at 484-85 (quoting *In re AOL Time Warner Sec. & 'ERISA' Litig.*, 381 F. Supp. 2d 192, 240 n.51 (S.D.N.Y. 2004)). In particular, Plaintiffs argue that the following "red flags" provide strong circumstantial evidence of recklessness, sufficient in the aggregate to support an inference of scienter: (1) Sinotech's "sole import agent," "sole chemical supplier," and "five largest subcontracting customers" were all shell companies without substantial revenues or signs of operation; (2) Sinotech's "oil-drilling technology is questionable, mispriced and uncompetitive;" (3) Sinotech's "audited financial statements filed with the Chinese SAIC demonstrated negligible business operations;" (4) SinoTech's board of directors lacked independence and did not effectively oversee the Company's management, evidenced by undisclosed related party dealings;" (5) Sinotech paid only $ 1.2 million per LHD Unit, and not $ 6.5 million as claimed; and (6) SinoTech operated "materially less LHD Units than it claimed." Pl. Opp. 14-15.

Plaintiffs' theory of scienter is based upon the allegation that "non-party, non-auditor" Alfred Little, which had no "access to the Company's internal documents and personnel" was aware of these red flags. Pl. Opp. 15.[8] In Plaintiffs' own words, "if such a person could discover the foregoing information, then the only possible inferences therefrom are that [EYHM] either discovered and concealed this information or failed to discover this information because its audit was so thoroughly deficient as to be the equivalent of no audit at all." *Id.*

i. Awareness of the red flags

For purposes of surviving a motion to dismiss, auditor scienter can be established by allegations that the auditor was aware of "red flags" of fraud and yet recklessly disregarded them. *See In re CBI*, 419 B.R. at 567. Here, Plaintiffs argue that, if outsider Alfred Little was able to discover the fraud without access to SinoTech documents, it follows that EYHM *did* discover the fraud *because of* its access to SinoTech documents. *See* Pl. Opp. 15. As a preliminary matter, it is well established that, for purposes of evaluating whether a plaintiff has met the demanding pleading requirements for auditor scienter, "auditor *access* is not tantamount to auditor *awareness.*" *Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 332. As another district court has put it, the fact that "a person has broad access to every book in a library does not mean that the person has read and chosen to ignore facts contained in a particular book in the library." *In re aaiPharma Inc. Sec. Litig.*, 521 F. Supp. 2d 507, 513 (E.D.N.C. 2007). *See also Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 451 (S.D.N.Y. 2010) (finding that alleged red flags did not support auditor scienter where "Plaintiffs fail[ed] to allege that the [auditor defendants] were sufficiently aware of the red flags cited"). Plaintiffs, moreover, have

---

[8] Among other things, EYHM argues that "the claims based on the Alfred Little report are in and of themselves insufficient as a basis for demonstrating fraud," because Alfred Little is an anonymous source whose allegations have not been corroborated. Def. Br. 12-13 (citing *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976, 2008 WL 4449280, at *16 (S.D.N.Y. Sept. 30, 2008)). Because the Court finds Plaintiffs' pleadings insufficient for other reasons, it need not reach this issue.

not sufficiently pled that EYHM had access to the incriminating information, as the Complaint is utterly devoid of allegations that the internal documents to which EYHM had access even contained the "red flags" giving notice of the underlying fraud. That is, Plaintiffs have not pled that the incriminating information was *in* a library book, let alone that EYHM read and ignored it.

The Court is not persuaded to reach a different conclusion merely because EYHM was apparently outdone by "non-party, non-auditor" Alfred Little, which lacked access to the Company's internal documents and personnel. Pl. Opp. 15. *Cf. Iowa Pub. Employees' Retirement Sys.*, 919 F. Supp. 2d at 334 (finding that SEC discovery of fraud did not "suffice to support an inference of scienter on the part" of the auditor) (internal quotation marks and citation omitted). That Alfred Little was able to discover the alleged fraud without access to SinoTech's internal documents does not transform EYHM's access to those internal documents into awareness of either the "red flags" or the fraud. For while such discovery "certainly provides valuable evidence as to the nature and extent of the illegal activity. . . it does not constitute evidence that [the auditor] noticed the activity and chose to ignore it." *Id.* This is particularly true in light of the absence of any allegations that the internal documents to which EYHM did have access contained the "red flags." Accordingly, Plaintiffs have not sufficiently alleged that EYHM was aware of and yet disregarded the red flags.

### ii. Failure to discover the red flags

Plaintiffs further argue that, even if EYHM was not actually aware of the red flags, its failure to discover them indicates that "its audit was so thoroughly deficient as to be the equivalent of no audit at all." Pl. Opp. 15. In other words, Plaintiffs argue that EYHM would have encountered the red flags if they had been conducting "any kind of audit at all." *In re*

*Complete Mgmt. Inc. Sec. Litig.*, 153 F. Supp. 2d 314, 334 (S.D.N.Y. 2001).

In order for such un-discovered red flags to be probative of an auditor scienter, a plaintiff must plead with sufficient particularity facts showing that the auditor had access to the information constituting the red flags *and* that the auditor had a duty to review or check that information. *See Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 337-38 (finding alleged red flag did not give support scienter where auditor had no duty to investigate the records containing the red flag). To otherwise impose liability on auditors for failing to discover information that they had no obligation to examine "would expand their limited, circumscribed duty impermissibly." *In re Tremont Sec. Law, State Law and Ins. Litig.*, 703 F. Supp. 2d 362, 371 (S.D.N.Y. 2010). After all, mere negligence is not sufficient to support auditor scienter. *See Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 337 (citing *In re CBI Holding Co., Inc.*, 419 B.R. 553, 567 (S.D.N.Y. 2009)).

Plaintiffs have failed to sufficiently plead facts showing that EYHM's failure to discover the red flags itself supports scienter. Although Plaintiffs make the conclusory assertion that "the red flags would be clearly evident to any auditor performing its duties," Pl. Opp. 14, they do not allege *how* EYHM would have encountered the incriminating red flags in the course of their auditing duties. *Cf. Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 337 ("[A] successful pleading on this front would have not only alleged that [the auditor] had access to a certain set of information, but also explained the circumstances that would make an auditor in [that] position reckless to ignore the clear implications of fraud suggested by such circumstances."). Indeed, Plaintiffs have not even alleged that the red flags would have been reflected in documents that EYHM would have had a duty to examine. *Cf. In re Refco*, 503 F. Supp. 2d at 658 (finding allegations sufficient to support auditor scienter where "the complaint supports an inference that

14

the [red flag] was reflected in [the audited company's] books" and further alleges that "the fraud was documented in plain terms in numerous documents maintained at the Company") (internal citations omitted); *Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 338 (addressing red flags which were specifically alleged to have been "recorded by [the audited entity] as receivables," but not those that would not have been apparent in the audited entity's books). Accordingly, Plaintiffs allegations regarding the numerous red flags do not provide strong circumstantial evidence that EYHM performed its duties recklessly, and they are insufficient to plead auditor scienter on a motion to dismiss.

The Court is not persuaded otherwise by Plaintiffs' argument that Alfred Little's discovery of the fraud shows that "[EYHM's] audit was so thoroughly deficient as to be the equivalent of no audit at all. Pl. Opp. 15. This is because, as discussed in more detail below, Plaintiffs have not alleged, and the Report does not otherwise show, that the red flags identified in the Report were discovered through irregularities in SinoTech's books that "would have been visible to any auditor examining them." *Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 335. To the contrary, the Report itself states that "[a]uditors find it especially difficult to detect fraud in businesses like [SinoTech] that have few, or highly overpriced physical assets." Compl., Ex. A, at 29. As the Report itself indicates, and further discussed below, most if not all of the red flags identified were discovered through investigation of third-party entities, such as SinoTech's import agent and chemical supplier—*i.e.*, entities that Plaintiffs have not alleged that EYHM had any duty to investigate as SinoTech's auditor. *Cf. Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 335 (finding that SEC discovery of underlying fraud was not probative of auditor scienter where "the specific 'red flags' cited in the report . . . were indicators associated with [a third-party entity's] operations"); *In re Tremont*, 703 F. Supp. 2d at 371 (refusing to base auditor

scienter upon auditor's failure to investigate affiliated third-party entity).  Absent allegations that EYHM had a duty to examine the information containing the red flags, Plaintiffs cannot show even negligence, let alone the degree of recklessness required to adequately plead auditor scienter under the PSLRA.

The first red flag—that SinoTech's import agent, chemical supplier, and subcontracting customers were shell companies—was brought to light after "months of fieldwork" by Alfred Little, including, among other things, scrutiny of the SAIC filings of third-party entities, including SinoTech's purported import agent and MDF supplier, *see, e.g.,* Compl., Ex. A (Alfred Little report), at 3-4, 10, 14, 17-19; attempts to reach such third-party entities by telephone, *see id.*, at 4, 10, 15; and visits to the physical addresses of such third-party entities, *see id.* at 6-8, 10-12, 15-16.  Significantly, Plaintiffs do not allege that, as SinoTech's auditor, EYHM had a duty to conduct such third-party investigations, let alone that no reasonable auditor would have failed to do so.  The cases cited by Plaintiffs, *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105 (S.D.N.Y. 2013), and *In re China Educ. Alliance, Inc. Sec. Litig.*, No. CV 10-9349, 2011 WL 4978483 (C.D. Cal. Oct. 11, 2011), do not demonstrate otherwise.  In *McIntire*, the Court found that the allegation that "investigators visited [the issuing company's] facilities and found that no employees were actually working" was a "red flag" supporting scienter *as to the issuing company itself*, and *not* as to the company's auditors.  927 F. Supp. 2d at 126-27; *see also In re China Educ. Alliance*, 2011 WL 4978483, at *6 (same).  Here, by contrast, the red flag is based on a visit to a *third-party entity*, and the plaintiffs are seeking to establish the *auditor*'s scienter.  Accordingly, Plaintiffs have not sufficiently pled that that EYHM recklessly failed to discover that SinoTech's "sole import agent," "sole chemical supplier," and "five largest subcontracting customers" were all shell companies without substantial revenues or signs of

operation. Pl. Opp. 14.

Similarly, Alfred Little discovered the second red flag—that SinoTech's "oil-drilling technology is questionable, mispriced and uncompetitive," Pl. Opp. 14—by visiting SinoTech's competitors' websites, viewing SinoTech's competitors' SAIC filings, speaking with representatives of SinoTech's competitors, and conducting independent research of the industry, Compl., Ex. A (Alfred Little report), at 25-27. Again, Plaintiffs do not allege that EYHM had a duty to investigate SinoTech's competitors or conduct industry research, or that no reasonable auditor would have failed do so. Plaintiffs have therefore failed to plead that EYHM recklessly failed to discover this red flag and the fraud it purportedly reveals.

The third red flag identified in the Report—that SinoTech's "audited financial statements filed with the Chinese SAIC demonstrated negligible business operations," Pl. Opp. 14—is also based upon Alfred Little's investigation of third-party entities. In this case, the Report's conclusion that SinoTech's "audited financials filed with the Chinese government support" a finding of fraud is based upon Alfred Little's examination of the SAIC filings of TNH, which is SinoTech's "only PRC based subsidiary," Compl., Ex. A (Alfred Little report), at 24. Plaintiffs, however, do not allege, and the Report does not otherwise indicate, that EYHM had a duty to examine TNH's SAIC filings, or that no reasonable auditor would have failed to do so. Accordingly, Plaintiffs have not sufficiently pled that EYHM recklessly failed to discover the third red flag.

Likewise, Plaintiffs fail to adequately allege that EYHM was reckless in failing to discover the fourth red flag, *i.e.* that "SinoTech's board of directors lacked independence and did not oversee the Company's management, evidenced by undisclosed related party dealings." Pl. Opp. 14. Neither the Complaint nor the Report explains how Alfred Little reached the

conclusion that SinoTech's board of directors lacked independence and failed to oversee the Company's management, let alone alleges that no reasonable auditor would have failed to uncover this defect. The "undisclosed related party dealings" which evidence this red flag, moreover, were uncovered through Alfred Little's investigation of third-party entities such as SKY China Petroleum Services, whose CEO is SinoTech Chairman Qingzeng Liu, and Hebei Daofu, which "turns out to be controlled and owned by one of the founding shareholders (Peiju Yan) of [a SinoTech subsidiary]." Compl., Ex. A (Alfred Little report), at 27-28. Because it is not alleged that no reasonable auditor would have failed to conduct such an investigation of Sky China and Hebei Daofu and thereby uncovered the red flag, Plaintiffs have not adequately alleged that EYHM was reckless in failing to discover this information.

Finally, neither the fifth nor the sixth red flags—that SinoTech paid only $ 1.2 million per LHD Unit, not $ 6.5 million as claimed, and that SinoTech operated "materially less LHD Units than it claimed," Pl. Opp. 14-15—appear in the Report at all, *see* Compl., Ex. A (Alfred Little report), at 1. The Complaint, moreover, does not allege that EYHM had access to the information revealing these red flags, nor does it allege that any reasonable auditor would have discovered the red flags and the fraud they purportedly reveal. Accordingly, Plaintiffs have failed to sufficiently plead that EYHM recklessly failed to discover the fifth and sixth red flags.

### 2. Violations of GAAS and GAAP

Plaintiffs further argue that the alleged "GAAP and GAAS violations . . . taken together with other recklessness and motive allegations, weigh heavily in favor of a strong inference of scienter." Pl. Opp. 19. In particular, Plaintiffs claim that EYHM "falsely stated: (i) that its audit was reasonable and (ii) that SinoTech's financial statements were prepared in accordance with

GAAP," identifying in the Complaint the GAAP and GAAS standards purportedly violated.[9]

As Plaintiffs themselves recognize, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient," and must be "coupled with evidence of corresponding fraudulent intent" in order to state a securities fraud claim. *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal citation omitted). That is, in order to adequately show scienter based upon alleged GAAP and GAAS violations, Plaintiffs must allege not only that GAAP and GAAS violations occurred, but also: (1) the particular deficiencies that were present in the audit; (2) why those deficiencies violate the cited accounting standard; and (3) how the violation of the cited accounting standard establishes auditor scienter. *See Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 340. Plaintiffs' pleadings as to the GAAP and GAAS violations, however, consist entirely of conclusory allegations that those standards were violated with the requisite state of mind. Plaintiffs, for example, plead that "[EYHM] knowingly, or recklessly, issued a false unqualified audit opinion . . . and failed to take the steps required by [GAAS]. . . to expose SinoTech's improper financial reporting during the Class Period," Compl. ¶ 171; and that "the audit conducted by [EYHM] was knowingly or recklessly not performed in accordance with GAAS," *id.* ¶ 174.

Even in instances in which Plaintiffs allege that a particular accounting or auditing standard was violated, they allege no facts specifying the manner in which the standard was violated, or the consequences of that violation. Plaintiffs, for example, allege that "[EYHM] violated Auditing Standard ("AS") No. 12, which provides that the auditor should perform risk assessment procedures that are sufficient to provide a reasonable basis for identifying the risks of

---

[9] Plaintiffs specifically point to EYHM's noncompliance with Auditing Standards ("AS") Nos. 12 and 15,[9] (*see* Compl. ¶¶ 175, 177), GAAS Interim Audit Standards ("AU") §§ 110, 317 and 508,[9] (*see* Compl. ¶¶ 176, 178, 181(a)), GAAS General Standard No. 3,[9] (*see* Compl. ¶ 179), GAAS Reporting Standard No. 4,[9] (*see* Compl. ¶ 181(b)), and SEC Accounting Series Release No. 296. (*See* Compl. ¶ 184).

material misstatement, whether due to error or fraud." *Id.* ¶ 175.  Plaintiffs do not, however, plead any facts indicating what EYHM did to violate AS No. 12, or how the violation of AS No. 12 helps to establish that EYHM's conduct was so "highly unreasonable" and so "extreme [a] departure from the standards of ordinary care" as to meet the standard for auditor scienter. *Iowa Pub. Employees' Ret. Sys.*, 919 F. Supp. 2d at 331 (internal citations omitted).  Plaintiffs' remaining allegations of GAAS and GAAP violations likewise consist of nothing more than conclusory statements that EYHM violated a particular standard, without any allegations as to how that standard was violated, or why the violation indicates that EYHM knew of or was reckless in failing to uncover SinoTech's fraud. *See* Compl. ¶¶ 176-183.  Accordingly, Plaintiffs' allegations that EYHM violated GAAP and GAAS are not sufficient to support auditor scienter.

### 3. Size of Alleged Fraud

Finally, Plaintiffs argue that the magnitude of the fraud was such that "[EYHM] simply could not have missed it." Pl. Opp. 22.  While it is true that "a fraud of large magnitude provides some circumstantial evidence of scienter, just as failing to detect a large boulder in front of your face qualifies as circumstantial evidence of blindness," *In re Longtop Fin. Techs. Ltd. Sec. Litig.*, 910 F. Supp. 2d 561, 578 (S.D.N.Y. 2013) (citing *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 273 (S.D.N.Y. 2008)), it is also the case that "a fraud's large size, standing alone, is insufficient to show recklessness," *id.* (citing *Penn. Pub. Sch. Employees' Ret. Sys. v. Bank of Am. Corp.*, 874 F. Supp. 2d 341, 362-63 (S.D.N.Y. 2012)).

Plaintiffs have not alleged with any particularity that "the scale of the fraud was sufficiently great, as a percentage of [SinoTech's business], that [EYHM] was reckless in not catching it earlier." *In re Longtop*, 910 F. Supp. 2d at 578.  In support of its claim that the

magnitude of the fraud was so great as to support a finding of auditor scienter, Plaintiffs' briefing

points only to paragraph 144 of the Complaint, which merely restates the red flags identified in

the Report compiled by Alfred Little, and contains no allegations specifically addressing the

magnitude or scale of the fraud. *See* Pl. Opp. 23; Compl. ¶ 144. Paragraph 144 not only fails to

allege the magnitude of the fraud, it also fails to allege that EYHM engaged in any misconduct

with respect to that fraud. *See* Compl. ¶ 144 (identifying EYHM as SinoTech's auditor, but

failing to allege that EYHM either knew of the fraud or was otherwise reckless in failing to

discover it). These allegations are therefore insufficient to show that the magnitude of the fraud

itself supports a finding of auditor scienter, even when considered holistically with the rest of the

complaint.

### 4. Summary

As the foregoing demonstrates, Plaintiffs have not sufficiently alleged: (1) that EYHM

knew of and disregarded, or otherwise recklessly failed to discover, numerous red flags that the

underlying fraud was occurring; (2) that EYHM committed or overlooked violations of

accounting and auditing standards in a manner that establishes or supports scienter; or (3) that

the size of the underlying fraud was so large that it supports scienter. Whether considered

individually or in aggregate, these allegations do not "give rise to a strong inference of scienter"

that is "cogent and at least as compelling as any opposing inference one could draw from the

facts alleged." *Tellabs*, 551 U.S. at 323-24. Most significantly, Plaintiffs have made no

allegation that the underlying fraud was reflected in internal SinoTech documents that EYHM

had a duty to review as SinoTech's auditor. To the contrary, the allegations consistently indicate

that the underlying fraud was revealed by the SAIC filings, websites, and physical footprints of

outside third-party entities—that is, by information that EYHM is not alleged to have had an

obligation to review.  Having thus failed to plead facts giving rise to an inference that EYHM

knew of the fraud, or that no reasonable auditor would have failed to discover the fraud,

Plaintiffs have failed to meet the demanding standard for pleading auditor scienter, and EYHM is

entitled to dismissal of the § 10(b) and Rule 10b-5 claim against it.

    E. Making a False Statement

    EYHM also challenges the adequacy of the allegations that it is liable "for any false or

misleading [forward-looking statements] pleaded." Def. Br. 20; *see* Compl. ¶¶ 197-99.  In

particular, EYHM argues that the Complaint has failed to sufficiently allege that it "made" any

such forward-looking statements for purposes of § 10(b) and Rule 10b-5.

    Liability under § 10(b) and Rule 10b-5 is further limited to the "maker" of the false

statement. *Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296, 2301-02

(2011).  For these purposes, "the maker of a statement is the person or entity with ultimate

authority over the statement, including its content and whether and how to communicate it." *Id.*

at 2302.  As EYHM points out—and Plaintiffs do not contest—the Complaint is utterly devoid of

any allegations that EYHM possessed such ultimate authority over the forward-looking

statements at issue.  Moreover, as previously discussed, Plaintiffs have failed to establish that

EYHM knew of, or was otherwise reckless in failing to discover, the underlying fraud.

Accordingly, Plaintiffs have failed to adequately plead that EYHM is liable for false or

misleading forward-looking statements.

## V. CONCLUSION

For the foregoing reasons, EYHM's motion to dismiss is GRANTED.  This resolves

Docket Number 91.

SO ORDERED.

Dated: February 21, 2014
New York, New York

_____
ALISON J. NATHAN
United States District Judge

The Clerk of Court is directed
to close this case.  Any pending
motions are moot.